**CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KATARINA M. OLDJA, Petitioner, v. COMMISSIONER OF SOCIAL SECURITY, Respondents. | Civil Action No. 02-1973 (JCL) **MEMORANDUM AND ORDER** |

**LIFLAND, District Judge**

Katarina Oldja ("Oldja") appeals the final determination of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Social Security Disability Insurance Benefits ("SSDI") and her application for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). For the reasons set forth below, this Court will affirm the Commissioner's decision.

**PROCEDURAL HISTORY**

Oldja filed applications for SSDI benefits and SSI on December 15, 1994,

alleging disability since May 31, 1987. (Tr. at 69-71, 93-95). Both applications were denied, initially on June 24, 1995 (Tr. at 82-86, 96-101), and upon reconsideration on November 14, 1995. (Tr. at 88-92). Oldja filed an appeal and appeared before an Administrative Law Judge ("ALJ") on January 22, 1997. (Tr. at 35-68). In a decision dated February 25, 1997, the ALJ determined that Oldja was not entitled to SSDI benefits under §§ 216(i) and 223 of the Act or SSI under §§ 1602 and 1614(a)(3)(A) of the Act. (Tr. at 28). Oldja requested a review of the hearing decision, which the Appeals Council denied on December 17, 1998.

On February 16, 1999, Oldja commenced a civil action in the United States District Court for the District of New Jersey (Civil Action No. 99-645), claiming that the ALJ erred in finding that Oldja does not have any impairments that significantly limit her ability to perform work-related activities. The United States District Court remanded this case to the Commissioner of Social Security for further administrative proceedings. (Tr. at 284). Consequently, the Appeals Council vacated the final decision of the Commissioner and remanded the case to an ALJ with instructions to further consider and discuss the opinion of Oldja's treating physician, Dr. Ialomitza, that she has disabling impairments and include sufficient rationale for the finding that Oldja has the residual functional capacity

("RFC")[1] to perform medium work. The ALJ was also directed to further consider the claimant's maximum RFC during the entire period at issue and provide a rationale, with specific references to evidence of record, in support of the assessed limitations under Social Security Ruling 96-8,[2] including an evaluation of the treating source opinion and an explanation for the weight given to such opinion evidence. In addition, the ALJ was instructed to consider additional evidence provided by the treating source about what the claimant can still do despite the impairments. (Tr. at 284-85).

Following remand, a supplemental hearing was held on May 15, 2000, at which Oldja appeared. (Tr. at 382). The ALJ issued a new decision on December 28, 2000, and found that Oldja was not entitled to SSDI or SSI benefits. On January 24, 2002, Oldja again requested review of the hearing decision, which the Appeals Council denied after concluding that there were no grounds for review. (Tr. at 262).

Now before the Court is Oldja's appeal of the ALJ's decision.

---

[1]"RFC is what an individual can still do despite his or her limitations." Soc. Sec. Rul. 96-8p.

[2]Social Security Ruling 96-8p provides guidance on what the assessment of RFC should include: The RFC must discuss how the evidence supports each conclusion, cite to specific medical facts and nonmedical evidence, and consider only limitations attributable to medically determinable impairments. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must also explain why the opinion was not adopted. Id.

## FACTS

Oldja was born on October 20, 1938 in Yugoslavia. (Tr. at 69, 40). She completed school through the fourth grade, in Yugoslavia, and testified that she can only read and write limited English. (Tr. at 41). Oldja worked from 1982 to 1987 as a stock person in the deli department of a butcher shop. (Tr. at 107). She was required to carry meats from the freezer to the cooler and to slice cold cuts. (Tr. at 42-43). She stated that she spent the majority of her work day standing and walking. (Tr. at 43). She also testified that she had to lift up to 40 pounds. (Tr. at 43).

Oldja testified that she stopped working in May 1987 due to a back ailment, migraine headaches, an ulcer, and depression. She resides in a first-floor apartment with her husband and adult son. (Tr. at 38-39). She testified that her daughter, who lives in the second-floor apartment, does all of the cooking and laundry, and Oldja folds the dry laundry herself. (Tr. at 58). She also mends clothes and does some ironing and light housekeeping. (Tr. at 134). She attends church as often as she can, at least once a week, and stays for the service which lasts from one to two hours. (Tr. at 59, 122). She shops twice a month with her husband or daughter. (Tr. at 121). She also testified that she reads the bible, watches some television, and listens to religious tapes. (Tr. at 60).

Oldja stated that she could sit and stand for one-half hour at a time and that walking five blocks would be difficult for her. (Tr. at 56). She also stated that she could climb stairs if she took her time. (Tr. at 57). She is capable of caring for her personal needs. (Tr. 126). However, she does not drive or take public transportation. (Tr. at 122). Either her husband or daughter drives her wherever she needs to go. (Id.).

## MEDICAL HISTORY

From January 11, 1974 through March 9, 1990, Oldja was treated four to five times per year by Dr. George Ialomitza for recurrent episodes of migraine headaches, varicose veins, and allergies. (Tr. at 172). Dr. Ialomitza noted that she had unstable blood pressure and disabling migraine headaches. (Id.).

Oldja has been a patient of Dr. Anthony Laneve since April 28, 1988. At that time, she complained of headaches and persistent abdominal discomfort. (Tr. at 175). Blood work showed mild elevations in her liver function and an esophagram of her small bowel was normal. (Tr. at 175, 203). An ultrasound of her abdomen performed on May 11, 1988 was normal. (Tr. at 202). Because of the continued presence of abdominal pain, she was referred to Dr. Joseph G. Shami, a gastroenterologist, for testing.

On June 16, 1988, Oldja saw Dr. Shami and described her abdominal pain

as dull in nature accompanied by nausea and lasting all day on the days it occurs, approximately two days per week. (Tr. at 200). He reported normal physical examination results, a possible ulcer, and acute and chronic gastritis. (Tr. at 200-01). He prescribed Flagyl, Carafate, and Reglan. (Tr. at 201). On July 11, 1988, Dr. Shami reported that Oldja's symptoms had resolved due to the medication, but noted that if the symptoms persist, further testing may be needed. (Id.).

On October 20, 1988, Oldja was seen again by Dr. Laneve for acute chronic gastritis and varicose vein pain and swelling. Dr. Laneve advised her to wear compression stockings to help improve her circulation. (Tr. at 176).

On November 29, 1989, Dr. Laneve diagnosed Oldja with borderline hypertension and reported that she complained of headaches and vague abdominal pain, which was believed to be a recurrence of her peptic ulcer disease. (Id.). He prescribed Lopressor for her blood pressure and Fioricet for the stomach pain. He also advised her to have a CAT scan of the head, but Oldja refused. (Id.).

Oldja saw Dr. Laneve in August and December 1990, for follow-up treatment for her high blood pressure and gastritis. She continued treatment with Carafate and Lopressor. (Id.).

On April 5, 1991, Dr. Laneve again saw Oldja. Her blood pressure was normal, but she was diagnosed with sinusitis and bilateral otitis. Oldja was next

seen on April 25, 1991, and Dr. Laneve treated her for a urinary tract infection.

Dr. Laneve treated Oldja from April 25, 1991 through June 19, 1992 for hypertension and peptic ulcer disease. (Tr. at 176). On July 24, 1992, her blood tests were normal. (Id.). On November 13, 1992, Oldja was again diagnosed with hypertension, peptic ulcer disease, low back syndrome, and tension headaches. On November 23, 1992, she had a chest x-ray, which was normal. She also had an x-ray of her dorsal spine and mammography, which were normal. (Tr. 176, 337-38). An x-ray of her lumbar spine revealed minimal hypertrophic degenerative changes. (Tr. at 337). Her back pain was treated with Miflex, Felafen, and she continued on Carafate. (Tr. at 176).

From August 7, 1991 to May 11, 1992, Dr. Tom Hertig, a chiropractor, treated Oldja for lumbar pain, generalized spinal pain, and cephalgia. Dr. Hertig performed orthopedic and neurological tests. He diagnosed her with migraine headaches, thoracic fixation/segmental disfunction, lumbar intervertebral disk syndrome[3], and lumbar radiculalgia[4]. Dr. Hertig treated Oldja with muscular massage, trigger point therapy, and corrective chiropractic spinal manipulation.

---

[3] Disk syndrome is defined as "a constellation of symptoms and signs, including pain, paresthesias, sensory loss, weakness, and impaired reflexes . . . caused by intervertebral disk pressure." Stedmand's Medical Dictionary, 1752 (27th ed.).

[4]Lumbar radiculalgia is defined as back pain due to "irritation of the sensory root of a spinal nerve." Stedmand's Medical Dictionary, 1502 (27th ed.).

(Tr. at 174).

Dr. Hertig opined in a questionnaire that he completed for the State of New Jersey - Department of Labor that Oldja's ability to perform regular work-type activities was reduced at least moderately, due to persistent headaches which both limit her ability to perform physical work and affect her ability to think or concentrate clearly for any period of time. He also stated that her lumbar spine condition prohibits her from doing any type of work on a regular basis. (Id.). He explained that she has virtually constant muscular spasm and lumbar pain. Thus, standing, sitting, and handling objects are all activities not recommended. He advised Oldja against lifting, bending, carrying objects, and traveling. He also noted that Oldja's ability to hear and speak was limited by her reduced concentration level during headaches. (Id.).

On April 16, 1993, Dr. Laneve saw Oldja, who complained of headaches. Her blood pressure at that time was high and she was diagnosed with hypertension and peptic ulcer disease. She was maintained on Carafate and was started on Calan.

At Oldja's next office to Dr. Laneve on September 10, 1993, she complained of depression and pain in the right leg. She was still having headaches and dizziness. (Tr. at 176). Dr. Laneve noted that he believed she had

osteoarthritis of the lumbosacral spine with a radiculopathy to the L5-S1 distribution of the right leg. He also noted that her blood tests were normal, except for an elevated cholesterol level of 211. (Tr. at 176-77).

On May 12, 1994, Dr. Laneve examined Oldja who complained of back pain, headaches, and stomach pains. (Tr. at 177). He diagnosed her with hypertension, peptic ulcer disease, tension headaches, low back syndrome, and osteoarthritis. He continued to prescribe Carafate for her gastritis and started her on Ziac for the high blood pressure. (Id.). Oldja's blood tests were normal.

Oldja visited Dr. Laneve on August 5, 1994 for continued complaints of dizziness and left chest pain. Dr. Laneve repeated the diagnosis of hypertension, peptic ulcer disease, tension headaches, low back syndrome, and osteoarthritis. He continued to prescribe Carafate and Ziac and noted that Oldja had not been compliant with her high blood pressure medication. (Id.).

Dr. Laneve next saw Oldja on November 14, 1994. She again complained of a headache, but her dizziness had improved. She was treated for acute sinusitis, hypertension, peptic ulcer disease, tension headache, and osteoarthritis of the low back. (Id.).

Oldja underwent a mental status evaluation by Dr. Grosso on May 1, 1995. (Tr. at 204). He reported that she was alert, clear, and coherent. She claimed

never to have experienced a nervous breakdown or psychotic episode. He also reported that on one occasion, she was taken to the hospital for anxiety, and released a few hours later.[5] (Id.). She was neither agitated nor dysphoric during the interview and displayed adequate language skills. Dr. Grosso noted some evidence of mild depression, possibly dysthymia, and unspecified gastrointestinal problems and recurrent migraine headaches. (Tr. at 205). He opined that she had adequate cognitive function to manage money. (Id.).

Dr. M. D'Adamo, a state agency psychiatrist, reviewed the record on June 22, 1995 and assessed the effects of plaintiff's mental impairment. (Tr. at 73-81). He found that she had a non-severe affective disorder. (Tr. at 73). He opined that Oldja's daily activities had been moderately restricted due to her medical condition and that she had slight difficulties in maintaining social functioning. But he noted that she seldom had concentration, persistence, or pace deficiencies, which would result in the failure to complete tasks in a timely manner and never had episodes of deterioration or decompensation in work or work-like settings. (Tr. at 80).

On October 24, 1995, Dr. Laneve examined Oldja, who complained of coughing, sore throat, headaches, and pain in her sinuses. Also, Oldja complained

---

[5]No evidence of this hospital visit appears anywhere else in the record.

of pain on straight-leg raising on the right to 60 degrees. (Tr. at 177). X-rays of her sinuses showed no abnormalities. Dr. Laneve's physical examination of Oldja was unremarkable, with the exception of muscle tenderness in her lower back. He referred her to an ear, nose, and throat doctor because she complained of hoarseness. (Tr. at 178).

In a narrative report dated March 8, 1995, Dr. Laneve opined that Oldja's current back ailment prevents her from performing any prolonged sitting, standing, lifting, carrying, and walking. He also noted that, due to Oldja's history of depression, for which she currently takes Limbitrol, she has impaired memory with sustained lapses of concentration and periods of anxiety, depression, and panic attacks. (Id.).

On November 17, 1995, Dr. Laneve examined Oldja, who complained of headaches and severe lower back pain. (Tr. at 213). Dr. Laneve noted that her physical examination remained unchanged from prior visits, except for weight gain of 9.5 pounds. He prescribed Cytotec and Daypro to control her back pain. Dr. Laneve switched her from Cytotec, which she was unable to tolerate, to Pepcid on November 21, 1995. (Id.).

Dr. Laneve treated Oldja on February 15, 1996 for a migraine headache, associated with nausea, lasting, at that point, approximately one week and back

pain. (Id.). Dr. Laneve noted that he had difficulty treating Oldja's back pain because of her inability to tolerate most anti-inflammatory drugs, due to her peptic ulcer disease. (Id.). He prescribed Imitrex for her migraines and Carafate for epigastric discomfort. (Id.).

On March 13, 1996, Dr. Laneve stated in a second narrative report that Oldja's prognosis remained guarded for full recovery from her ailments: recurrent intractable migraine headaches, low back syndrome with right leg radiculitis, labile hypertension, and a history of peptic ulcer disease. (Tr. at 214). He opined that due to her back ailment and recurrent headaches, Oldja was not employable. He stated that she was not able to perform any activities with prolonged sitting, standing, lifting, carrying, or walking. He also noted that Oldja had a history of chronic depression associated with recurrent panic attacks. (Id.).

Oldja visited Dr. Laneve's office on July 3, 1996, November 8, 1996, and subsequently in 1997. (Tr. at 217-21). She complained of headaches, abdominal pain and lower back and shoulder pain. (Id.). Examinations were normal except for edema and mild abdominal discomfort. (Tr. at 217, 218, 221). Range of motion in her shoulder was reduced. (Tr. at 217). Dr. Laneve noted mild degenerative changes in her lower lumbar spine, left shoulder bursitis, and migraine headaches. (Tr. at 271, 221).

Oldja was taken to St. Joseph's Hospital and Medical Center on March 8, 1997 with injuries from a motor vehicle accident. (Tr. at 225-56). She had lacerations on her face and pain and swelling in her left shoulder and left knee. (Tr. at 238). An x-ray of Oldja's left knee showed a fracture of the left tibia and fibula. (Tr. at 227, 250). She underwent a procedure to repair the tibial fracture. She tolerated the procedure well and left the operating room in satisfactory condition. (Tr. at 227). At a physical therapy evaluation on March 10, 1997, following the procedure, she had mostly normal strength, tone, sensation and range of motion, with the exception of her left shoulder and her left leg (which was in a cast). (Tr. at 233). She was discharged on March 11, 1997, with instructions to follow up with the orthopedic clinic and with physical therapy, as needed. (Tr. at 226).

On June 8, 1999, Oldja saw Dr. Henry A. Budd, a urologist. (Tr. at 295-97). Dr. Budd's report indicated that she was very cooperative and in no acute distress. Urinalysis showed normal creatinine, normal 24-hour urine studies, and normal echogenecity and thickness around the cortex. (Tr. at 295). An ultrasound revealed bilateral grade II hydronephrosis, and she was diagnosed with hematuria and a bladder mass. (Tr. at 296).

On May 5, 2000, Dr. Laneve completed a questionnaire and provided his

assessment of Oldja's ability to do work-related activities. (Tr. at 352). He noted that he examined her last on April 7, 2000, and she suffered from high blood pressure, chest pain, and constipation with abdominal pain. He noted that she was alert, overweight, and walked with a cane. (Tr. at 356). Dr. Laneve also stated that she had gastritis, chronic low back pain with radiculitis, depression, recurrent headaches, mild thoracic osteoarthritis, and altered mental status, including forgetfulness. (Tr. at 357).

Dr. Laneve's questionnaire included test results from December 21, 1999. The results revealed osteoporosis and mid-thoracic spine degenerative disc disease. (Tr. at 362). Test results also revealed inflamation of the vocal membranes due to gastric reflux. (Tr. at 366).

Dr. Laneve opined in the questionnaire that the most Oldja could lift occasionally is two to three pounds. (Tr. at 352). He also stated that Oldja was capable of very little independent standing during the course of an eight-hour work day, and she always used a cane. (Tr. at 353). He opined that her impairment affected her ability to sit, but he did not indicate how many hours she could sit in an eight-hour work day. (Id.). He answered that her mobility was severely restricted, she could never kneel or crawl, and could occasionally crouch, stoop, balance, and climb due to her osteoarthritis, osteoperosis, and a leg fracture.

(Tr. at 358). He also indicated that Oldja was limited in her ability to reach, bend, push and pull, but he did not list the medical findings that supported his assessment. (Tr. at 359). Dr. Laneve stated that, due to a multitude of medical problems, Oldja was considered "totally disabled" at that time. (Tr. at 360).

On June 1, 2000, Dr. Laneve stated in a letter that Oldja was permanently disabled from December 1987 through December 1992 due to labile hypertension, depression anxiety disorder, chronic low back syndrome with radiculitis right leg, intractable headaches, and peptic ulcer disease. (Tr. at 381).

**STANDARD OF REVIEW**

A reviewing court must uphold the Commissioner's decision to deny disability benefits if an examination of the whole record reveals that substantial evidence supports the Commissioner's conclusion. 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Jesurum v. Sec'y of the U.S. Dep't of Health & Human Servs., 48 F.3d 114, 117 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It is less than a preponderance of the evidence but more than a mere scintilla." Id.

The fact that the record contains evidence which would support a different conclusion does not undermine the Commissioner's decision so long as there is

substantial support for the decision in the record. See Flecha v. Shalala, 872 F. Supp. 1312, 1315 (D.N.J. 1994) (citing Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972)). Thus, the reviewing court must look to the record as a whole to determine whether substantial evidence supports the Commissioner's conclusions. See Taybron v. Harris, 667 F.2d 412, 413 (3d Cir. 1981).

To determine whether the Commissioner's findings are supported by substantial evidence, the reviewing court must consider objective medical facts, diagnoses or medical opinions based on those facts, subjective complaints of pain or disability, and the claimant's age, education, and work history. See Jones v. Harris, 497 F. Supp. 161, 167 (E.D. Pa. 1980). However, if the Commissioner denies benefits based on the determination that the claimant does not have a severe impairment, the Commissioner does not have to consider the claimant's age, education, and work history. See Bowen v. Yuckert, 482 U.S. 137, 148 (1987).

The ALJ is responsible for reviewing the evidence and making findings of fact and conclusions of law. See 20 C.F.R. § 404.1527(f)(2) (1991). Where the evidence supports more than one rational interpretation, the court must uphold the ALJ's conclusion. See Alexander v. Shalala, 927 F. Supp. 785, 791 (D.N.J. 1995) (citing Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982)). Pursuant to 42 U.S.C. § 405(g), a district court has the authority to modify, affirm, or reverse the

ALJ's decision without a remand to the Commissioner for a rehearing. See Gilland v. Heckler, 786 F.2d 178, 184 (3d Cir. 1986). The court cannot, however, try the case de novo or substitute its own conclusions for those of the ALJ. See Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) (courts are bound by the Secretary's findings of fact where they are supported by substantial evidence).

## DISCUSSION

### A. The Statutory Framework

The Social Security Act provides the Secretary of Health and Human Services with the authority to adopt rules and regulations implementing the disability benefits system. Rosetti v. Shalala, 12 F.3d 1216, 1218 (3d Cir. 1993) (referring to 42 U.S.C. §§ 405(a), 1383(d)(1)). In the exercise of this authority, the Social Security Administration utilizes a five-step procedure for the evaluation of disability claims. 20 C.F.R. § 404.1520. The Supreme Court explained the operation of this sequential process as follows:

> The first two steps involve threshold determinations that the claimant is not presently working, and has an impairment which is of the required duration[6] and which significantly limits his ability to work. See 20 C.F.R. §416.920 (a) through (c) (1989). In the third step, the medical evidence of the claimant's impairment is compared to a list

---

[6]The impairment must be one that is expected to result in death or that has lasted or can be expected to last for a continuous period not less than twelve months. Williams v. Sullivan, 970 F.2d 1178, 1180 (3d Cir. 1992).

> of impairments presumed severe enough to preclude any gainful work. See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A) (1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920 (d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920 (e) and (f).

Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990).

This five-step evaluation requires shifting burdens of proof. Wallace v. Sec'y of Health and Human Services, 722 F.2d 1150, 1153 (3d Cir. 1983). After a determination by the Commissioner that the claimant has not been employed and has a disability which is severe, the claimant then bears the burden at step four of demonstrating, with a showing of medical evidence, that she is unable to perform her past work. See 42 U.S.C. § 423(d)(2)(A) (to be disabled a claimant must be unable to do her previous work due to a medically determinable impairment); 20 C.F.R. §§ 404.1520(e), 416.920(e). It is only after the claimant has demonstrated her inability to perform her past work that the burden shifts back to the Commissioner, at step five, to establish the claimant's residual capacity to perform other work. Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

In cases of more than one impairment, the ALJ must review the claimant's

symptoms, signs and medical records to determine whether the combination of impairments is medically equal to any listed impairment. 20 C.F.R. § 404.1526. The ALJ is required to explain reasons supporting his decision. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). In deciding disability matters, a reviewing court needs from the ALJ not only an expression of evidence considered by the ALJ which supports the result but also some indication of evidence which was rejected. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

**B. The ALJ's Decision**

The ALJ applied the appropriate procedure in concluding that Oldja was not disabled. For disability insurance benefit purposes, Oldja is last insured through December 31, 1992. Therefore, she must establish a disability that began on or before that date. In addition, although Oldja alleges an onset of disability prior to her application's filing date, an individual cannot be found eligible for SSI for any month prior to the month in which the application is filed. See 20 C.F.R. § 416.335.

First, the ALJ found that Oldja had not engaged in any substantial gainful activity since at least May 31, 1987, the alleged onset date. (Tr. at 271). Then the ALJ determined that the medical evidence established that Oldja's back

impairment and migraine headaches were "severe." (Tr. at 273). However, the ALJ concluded that there was no evidence of an impairment, or combination of impairments, which either met or equaled the level of severity of any impairment described in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the listings"). (Tr. at 273). The ALJ also found that Oldja's subjective allegations of disabling impairments were not entirely credible. (Tr. at 273). In light of the entire record, the ALJ determined that Oldja had the RFC to perform medium work[7] that was not complex in nature and did not involve exposure to unprotected heights or dangerous equipment. (Tr. at 276).

Finally, the ALJ evaluated Oldja's past work as a stock clerk in a deli and determined that she retained the RFC to perform the functional activities of that job, as Oldja had described it. (Tr. at 275, 276). Accordingly, the ALJ held that Oldja was not under a disability, as defined by the Act, from the time of the alleged onset date through the date of the ALJ's decision. (Tr. at 276). Because the ALJ found that Oldja was capable of performing her past relevant work, he did not reach step five of the sequential analysis.

[7]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§ 404.1567(c) and 416.967(c).

**C. Analysis**

Oldja contends that the ALJ's decision was not supported by substantial evidence. Specifically, Oldja argues that: (1) the ALJ erred in finding that she did not have any impairments which significantly limited her ability to perform work-related functions; (2) the ALJ made no effort to show the availability of jobs which Oldja was capable of performing to support his denial of benefits; and (3) the ALJ failed to develop a complete administrative record.

**1. The ALJ's consideration of the evidence**

Oldja argues that the ALJ's decision was not supported by substantial evidence. Specifically, Oldja argues that the ALJ erred in finding that she did not have any impairments which significantly limited her ability to perform work-related functions.

Where there is substantial evidence to support the ALJ's conclusions, the decision may not be reversed. 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence does not mean all of the evidence in the record, or even a preponderance of it. Rather, it is only sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Therefore, even where there is evidence in the record to support a conclusion

different from the ALJ's, his decision must be upheld if it is supported by substantial evidence. See Flecha v. Shalala, 872 F. Supp. 1312, 1315 (D.N.J. 1994) (citing Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972)).

Furthermore, pursuant to 20 C.F.R. § 404.1527(d)(2) and SSR 96-2p, the Commissioner must afford controlling weight to a treating physician's opinion on the issues of the nature and severity of a claimant's impairment, but only if that opinion meets certain requirements. First, the opinion must come from a treating source and be a "medical opinion." SSR 96-2p. A "medical opinion" is one about the nature and severity of an individual's impairment. SSR 96-2p. In addition, the medical opinion must be well-supported by medically acceptable clinical and diagnostic techniques, and not inconsistent with other substantial evidence of record. SSR 96-2p. In the absence of any of the foregoing factors, the opinion is not entitled to controlling weight. SSR 96-2.

In this case, after evaluating the objective medical evidence, the ALJ found that Oldja suffered from a back impairment and migraine headaches which limited her ability to perform basic work-related functions. (Tr. at 273). However, the ALJ did not find that Oldja's impairments precluded her from performing work-related activities on a sustained basis. In addition, the ALJ found that the record included minimal evidence to support a finding that Oldja's back impairment

precluded her from performing the requirements of her prior work. Furthermore, the ALJ found that although Oldja experienced migraine headaches, they only occurred on an episodic basis. (Tr. at 273).

**(a) The ALJ's assessment of Oldja's treating physicians' opinions**

The ALJ accorded proper weight to Oldja's treating physicians. In assessing Oldja's RFC under the fourth step of the sequential analysis, the ALJ correctly concluded that the report submitted by Dr. Ialomitza, Oldja's treating physician from 1974 to 1990, did not merit significant weight. The report consisted of one page of Dr. Ialomitza's responses to the Social Security Administration's request for information. The report simply stated that Oldja had recurrent episodes of disabling migraine headaches. It did not refer to any medical evidence, such as notes or laboratory testing. (Tr. at 174-75). The ALJ noted that even though Dr. Ialomitza opined in this report that Oldja's impairments were "disabling," nothing in the record supported this opinion. Dr. Ialomitza's report did not include any information about Oldja's symptoms or explicit limitations. (Tr. at 275). It only noted that he treated her for migraine headaches, allergies, and varicose veins. (Id.) Dr. Ialomitza's submission did not even mention Oldja's back ailment, one of the primary reasons she stopped working in 1987. (Tr. at 43-46). Furthermore, Dr. Ialomitza's claim that Oldja suffers from disabling

headaches was not supported by clinical, laboratory, or any diagnostic techniques. Thus, the ALJ was justified in not attributing significant weight to Dr. Ialomitza's assessment of Oldja's impairments.

In finding that Oldja was able to perform medium work, the ALJ also gave proper weight to the conclusions of Dr. Laneve, Oldja's treating physician since 1988. (Tr. at 274). While Dr. Laneve's records showed that Oldja received treatment for migraine headaches and low back syndrome, the test results accompanying Dr. Laneve's reports did not reveal a disability rendering Oldja unable to perform any work activity. Her blood pressure readings had occasionally been mildly elevated, but the ALJ noted that an abdominal sonogram and upper GI series were both within normal limits (Tr. at 200-02). Also, an x-ray of Oldja's lumbar spine revealed only minimal hypertrophic degenerative changes (Tr. at 337). Furthermore, range of motion tests performed by Dr. Laneve showed only mild limitations, such as pain on a straight-leg raising test to 60 degrees, on the right side, and some lumbar muscle tenderness. (Tr. at 177). However, Dr. Laneve did not note any evidence of muscle atrophy, muscle spasm, or deficits in reflex, sensory or motor function, which usually accompany chronic or acute back impairments. (Tr. at 213-14).

The ALJ noted that while Dr. Laneve's treatment notes over the years

indicated that Oldja has borderline hypertension, vague abdominal pain, varicose vein pain, low back pain, and headaches, the objective medical evidence failed to substantiate Dr. Laneve's claim that these impairments limited Oldja's ability to perform work-related activities. (Tr. at 272). Specifically, the ALJ referred to the following tests performed in 1992: chest-x-ray, dorsal spine examination, and mammography. All yielded negative results. In addition, her blood tests were normal and the sinus x-ray taken in 1994 showed no signs of abnormalities. (Tr. at 176-77).

Dr. Shami, a gastroenterologist, found gastritis and possible ulcer disease in June 1988. However, he also noted that Oldja's symptoms had resolved with medication. (Tr. at 201). Although Oldja's symptoms returned, the ALJ noted that the recurrence arose only after she stopped using the medication. (Tr. at 272). Furthermore, the ALJ found that there were no indications that Oldja had any gastrointestinal impairments that had more than a minimal impact on her ability to function. (Tr. at 273).

Dr. Laneve also reported that Oldja suffered from depression, lapses of concentration, and periods of anxiety. (Tr. at 214). However, the ALJ pointed to the mental status evaluation conducted by Dr. Grosso, which concluded that Oldja was alert and oriented, and displayed no evidence of agitation or dysphoria. While

Dr. Grosso noted that some depression was present, he assessed that it was only mild in nature. (Tr. at 204-05). The ALJ considered the functional consequences of the depressive manifestations reported and found only slight to no limitations with respect to Oldja's ability to engage in activities of daily living, social functioning, concentration, persistence, or pace. (Tr. at 274)

The ALJ also reviewed a report submitted by Dr. Hertig, a chiropractic physician who treated Oldja from August 7, 1991 through May 11, 1992. (Tr. at 173). Although a disability claim cannot rest entirely on a chiropractor's opinion, an ALJ may consider opinions of chiropractors "insofar as it is relevant to assessing a claimant's disability." Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1999). However, the ALJ noted that in this case, Dr. Hertig performed no diagnostic tests, only neurological and orthopedic examinations. Dr. Hertig reported evidence of lumbar and cervical pain and motion limitations. He also concluded that Oldja's impairments rendered her unable to work on a regular basis due to her pain and decreased ability to think and concentrate. The ALJ properly rejected this opinion primarily because Dr. Hertig is a chiropractor and is not identified by the regulations as an acceptable medical source. See 20 CFR §§ 404.1513 and 416.913. Although a chiropractor's opinion may be considered in some circumstances, here, Oldja was under Dr. Hertig's care only for a short time.

In addition, the ALJ rejected Dr. Hertig's comments relative to Oldja's mental state because such problems do not fall within Dr. Hertig's area of expertise. (Tr. at 273). Furthermore, the ALJ noted that Dr. Hertig's opinion was neither supported by any objective medical evidence or notes of treatment, nor was it substantiated by the weight of evidence contained in the record. (Tr. at 275). Thus, the ALJ did not err in according little weight to Dr. Hertig's report.

Although Dr. Ialomitza, Dr. Laneve, and Dr. Hertig all concluded that Oldja's impairments were "disabling," the ALJ properly rejected these opinions and found that Oldja was capable of performing her past relevant work. Objective testing failed to support Dr. Laneve's assessment of Oldja's restrictive functional limitations or his opinion of Oldja's disability. A treating physician's opinion may be found controlling if it is well-supported by medically acceptable clinical and diagnostic laboratory testing techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d) and 416.927(d). Here, the ALJ found that Dr. Laneve's opinion was not supported by his own medical reports and laboratory diagnostic techniques. (Tr. at 275). Although an x-ray of Oldja's lumbar spine revealed minimal hypertrophic degenerative changes (Tr. at 337), and other testing revealed mid-thoracic degenerative disc disease (Tr. at 336), Dr. Laneve's contemporaneous office notes did not reflect functional

limitations at the time of the examinations. Furthermore, although the ALJ did not dispute the existence of a back impairment and migraine headaches, the record did not support a finding that these impairments limited Oldja's ability to perform basic work-related functions. (Tr. at 273).

The ALJ also properly rejected the opinions of Dr. Ialomitza and Dr. Hertig. Dr. Ialomitza's opinion was unaccompanied by any objective medical evidence, such as notes or laboratory testing. (See Tr. at 172). Dr. Hertig's opinion was also not supported by any objective medical evidence or accompanied by notes of treatment. Thus, the ALJ properly did not give controlling weight to Dr. Laneve or to the other treating source opinions.

It is the ALJ who determines the existence of a disability. An ALJ is ultimately responsible for assessing a claimant's residual functional capacity. The ultimate finding of a disability is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e); See SSR 96-5p. Here, with support in the record, the ALJ found that the objective medical evidence did not support Oldja's allegations. (Tr. at 272-75).

**(b) The ALJ's assessment of Oldja's credibility**

The ALJ also properly assessed Oldja's testimony and credibility. The ALJ evaluated Oldja's subjective complaints and found that they were not credible to

the degree of incapacitation asserted. (Tr. at 273). "The extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of those statement." Soc. Sec. Rul. 96-7. Here, the ALJ considered Oldja's allegations of pain due to migraine headaches and low back impairment along with her treatment choices, consistency of complaints, and activity level. (Tr. at 273). The ALJ noted that her headaches occurred sporadically and, in November 1994, responded well to treatment. (Tr. at 177).

Oldja also claimed that low back pain prevented her from working. Yet, the record failed to show any significant signs of a disabling impairment, such as sensory loss or muscle atrophy. The ALJ also noted that at no time did Oldja see a specialist or physical therapist for her back.

Furthermore, her activity level suggested a higher degree of functioning than Oldja claimed. The ALJ found significant Oldja's statements that she frequently watched television and read, without any difficulty following the story lines. (Tr. at 274).

It is well-settled that the ALJ has the authority to find a claimant's allegations of pain and other subjective complaints not credible. Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983). The ALJ has the discretion "to

evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of HHS, 504 F. Supp. 288 (E.D.N.Y. 1980)). Furthermore, an ALJ may reject a subjective claim of disabling pain if "he [has] consider[ed] the subjective pain and specif[ied] his reasons for rejecting these claims and [has] support[ed] his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990). Here, the ALJ appropriately considered all of the evidence, including Oldja's allegations of pain, and found that her subjective complaints were inconsistent with the medical evidence and her activity level. Thus, the ALJ's decision was supported by substantial evidence as to Oldja's credibility.

While the ALJ found that Oldja suffered from some degree of a spinal impairment and migraine headaches, the medical evidence and evidence of her daily activities do not support a finding that the pain and limitations Oldja experienced occurred with such intensity, persistence, or frequency that precluded her performance of work-related activities on a sustained basis. (Tr. at 274). The ALJ was convinced that Oldja's impairments precluded her from heavy lifting. However, the ALJ did not find Oldja unable to frequently lift up to twenty-five

pounds with occasional heavier lifting up to fifty pounds. The ALJ also noted the absence of objective medical evidence indicating that Oldja could not sit, stand, and walk as needed throughout the course of an eight-hour workday. (Tr. at 274). Furthermore, the ALJ recognized that the nonexertional limitations Oldja experienced, in particular dizziness associated with her migraine headaches, would preclude her from engaging in work that involved unprotected heights or around moving or dangerous machinery. She was also precluded from performing highly-complex jobs. However, Oldja remained capable of performing jobs with low to moderate levels of complexity.

The ALJ's finding that Oldja was capable of performing her past job as a stock clerk was supported by substantial evidence. Based on all of the evidence, the ALJ properly determined that Oldja was able to perform medium work with specific non-exertional limitations. The ALJ then proceeded to determine whether Oldja could perform her past relevant work. (Tr. at 275). The ALJ considered Oldja's exertional and nonexertional limitations, applied them to the requirements of Oldja's past work as a stock clerk, and found that she was able to perform her past relevant work. (Tr. at 276). Oldja indicated in two separate documents that her job entailed virtually no lifting and limited sitting, standing, and walking. (Tr. at 108, 118). She subsequently asserted that she had to lift objects weighing up to

forty pounds. It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). Here, the ALJ determined that Oldja's past work as a food store clerk did not require any functional activities that were precluded by her impairments. (Tr. at 276). The ALJ found that her RFC, despite her impairments, was consistent with the functional demands and job duties inherent in her past work, as she described it both in writing and orally. (Tr. at 276). Furthermore, the job of a stock clerk in a food store does not involve complex tasks, unprotected heights, or moving machinery. See U.S. Department of Labor, Dictionary of Occupational Titles, 202 (4th ed., rev'd. 1991) (description of "stock clerk"). Therefore, the demands of Oldja's past relevant work did not exceed her RFC and the ALJ correctly found that Oldja was capable of performing her past relevant work.

**2. The ALJ's failure to reach step five**

Oldja contends that the ALJ made no effort to show the availability of jobs in the national economy which Oldja was capable of performing to support his denial of benefits. However, this argument must fail because the sequential evaluation is designed to be taken one step at a time, in the order specified. See 20 C.F.R. § 404.1520(a)(4). The requirement that the ALJ must identify work that

exists in the national economy is part of the criteria examined at step five. Id. Here, the ALJ properly found that Oldja was not disabled at step four because she could perform her past relevant work. Once the ALJ makes a determination at step four that the plaintiff is capable of performing a past relevant job, the evaluation stops. Thus, the ALJ did not need to shoulder the step-five burden of having to show the availability of jobs in the economy which Oldja could perform.

**3. The ALJ's failure to develop the record**

Finally, Oldja argues that the ALJ failed to develop a complete administrative record. Oldja cites to authority standing for the proposition that the ALJ has a duty to develop the record: Dembrowsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979) (stating that ALJ has special responsibility with regard to unrepresented claimant at hearing) and Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980) (stating that "if it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand or reversal"). These cases both involve unrepresented claimants. Here, Oldja was represented by counsel. In addition, Oldja's case leaves no question as to whether the record was fully developed. Notably, the record contains a letter from Oldja's attorney requesting that the file be left open for a submission of additional medical evidence. The

additional time was granted, and there is no reason to believe that, following this submission, the record was incomplete. (Tr. at 380). Moreover, the ALJ is only required to take affirmative steps to develop the record when the evidence received from the claimant's treating physician or other medical source is *inadequate* for the ALJ to determine whether the claimant is disabled. 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (emphasis added). Here, evaluations performed by Oldja's treating physician, Dr. Laneve, Oldja's testimony, and the medical record as a whole provided the ALJ with substantial evidence that Oldja remained capable of performing her past relevant work. Therefore, the ALJ did not fail his duty to fully develop the record.

## CONCLUSION

For the reasons set forth above, this Court concludes that the ALJ's findings are supported by substantial evidence.

Accordingly, **IT IS** on this 29th day of June 2005,

**ORDERED** that the decision of the Commissioner of Social Security denying SSI and SSDI benefits to Katarina Oldja is affirmed.

/s/ John C. Lifland, U.S.D.J.